

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| POLYMER DYNAMICS, INC., | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 99-4040** |
| | : | |
| BAYER CORPORATION, | : | |
| **Defendant.** | : | |
| | : | |

**FILED**

AUG 1 5 2007

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

Tucker, J.                                          August _10_, 2007

### MEMORANDUM AND ORDER

Presently before this Court are Defendant's Motion for Judgment as a Matter of Law or in the Alternative to Alter or Amend the Judgment (Docs. 279 & 289), Plaintiff's Response in Opposition (Docs. 280 & 298), Plaintiff's Motion to Alter or Amend the Judgment or in the Alternative for a New Trial (Docs. 281 & 290), Defendant's Answer and Brief in Opposition (Docs. 285 & 299), and Plaintiff's Supplement to Its Post-Trial Motion (Doc. 286). The Court heard oral argument on Monday, November 21, 2005. For the reasons set forth below, the Court will deny Plaintiff's Motion for a New Trial or to Alter or Amend the Judgment, and deny Defendant's Motion to Alter or Amend the Judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Negotiation and Purchase

Polymer Dynamics, Inc. ("PDI" or "Polymer") is a Pennsylvania corporation in the business of designing, manufacturing and selling insoles, midsoles and outsoles to the footwear industry. This lawsuit arises out of PDI's purchase of five high pressure polyurethane machines from the Defendant, Bayer Corporation ("Bayer"), for its new production process. After investing $50 million

over an eleven-year period, PDI developed a vertically integrated manufacturing process to aid shoe manufacturers in designing parts and creating chemical formulations for molds, a process which included the use of multiple cavity molds ("supermolds") and relied on polymer chemical formulations, robotics and high speed flexible manufacturing. In 1995, PDI used low pressure polyurethane mixing machines in its Flexible Manufacturing System II ("FMS II"), and sought to incorporate high pressure polyurethane machines into its new process, Flexible Manufacturing System III ("FMS III"). Specifically, PDI wanted a machine that would meter and mix 30 shots every 28 seconds on a continuous basis, all day long, doing millions of shots a month, and making 32 parts in 30 seconds, without maintenance or very long down times. Hennecke Machinery Group ("Hennecke"), a subdivision/business unit of Bayer's Polyurethane Division, was a manufacturer of high pressure polyurethane machines.

In 1995, the parties entered into negotiations which led to PDI's purchase of two high pressure polyurethane metering, mixing and dispensing systems and machinery known as HK 270 polyurethane machines (the "Polyurethane Machines") from Bayer. The Polyurethane Machines were made by Hennecke. According to PDI, Bayer-Hennecke represented that it could build the machines to meet PDI's specifications, in particular, the specification that the machines could meter and mix 30 shots every 28 seconds without long respites for maintenance. In connection with the negotiations, PDI required that Bayer sign a disclosure agreement (the "Disclosure Agreement") prior to Bayer representatives visiting PDI's plant in December 1995. The Disclosure Agreement applied to disclosures made from December 1, 1995 to November 30, 1996, and did not cover other Bayer affiliates unless the affiliate first agreed to be bound by the terms of the agreement. PDI subsequently contracted to purchase two Bayer high pressure polyurethane machines in May 1996.

In August 1996, PDI entered into negotiations with Bayer to purchase three additional high pressure polyurethane machines. The second contract was executed in June 1997, after Bayer arranged for PDI to obtain financing for the machines from its subsidiary Bayer Financial Services ("Bayer Financial"). PDI entered into a lease agreement with Bayer Financial for the additional equipment. The agreement was structured as a recourse loan backed by Hennecke and called for PDI to make a $300,000 down payment, followed by 48 monthly payments of $19,625 and a $1 buyout. PDI assumed possession of the additional machines later that month, in June 1997.

**B.     Post-Contractual Events**

PDI alleged that when the Bayer machines were placed into production, they experienced ongoing problems with, inter alia, premature wear of the injectors, nozzles and pintles component parts due to the high shooting velocity and poor mixing of chemicals, which resulted in the production of a defective product. In particular, PDI claimed that the Bayer machines could not consistently shoot 30 shots every 28 seconds and that as a result PDI suffered long down times as it attempted to repair and replace component parts. This latter failure was particularly significant to PDI because the competitive pricing advantage PDI sought to have over competitors turned on its ability to quickly and reliably produce large quantities of its product.

From June 1997 to October 1998, Bayer offered technical assistance and repair services to PDI in an attempt to remediate the problems PDI was experiencing with the Bayer machines. For this purpose, Bayer was given access to PDI's polyurethane machines, as modified by PDI, as well as access to PDI's trade secrets and other proprietary information regarding its manufacturing process. Bayer also arranged for representatives from Hennecke Maschinenfabrik GmbH ("Hennecke Germany"), a subsidiary of Bayer AG, Bayer's corporate parent, to inspect PDI's

3

equipment and participate in meetings held in the United States and Germany to address the ongoing problems about which PDI complained. Bayer regularly made use of Hennecke Germany representatives as "in-house experts" to provide expertise in areas it was lacking, and, in the process, disclosed PDI's proprietary information to Hennecke Germany and other Bayer subsidiaries. Neither Hennecke Machinery nor Hennecke Germany was made party to the Disclosure Agreement. Throughout this entire period, Bayer and Hennecke Germany represented to PDI that the problems with the Bayer machines were due to PDI's chemical formulations which were abrasive and causing premature wear of the nozzles and pintles.

PDI investigated the problems with the Bayer machines, and its experts determined that the problems were due to the lack of concentricity between the pintles and nozzles. Bayer patents also identified lack of concentricity as a possible cause for problems of the kind PDI experienced. PDI discovered that Bayer had failed to follow the teachings of its patents in building the machines it sold to PDI and this defective manufacturing contributed to PDI's continuing problems. PDI eventually engineered a solution to its problem with the Bayer machines and continues to employ them in its FMS III manufacturing process using the same chemical formulation that it did when it first purchased the machines, but no longer purchases injectors, nozzles or pintles from Bayer.

After having access to PDI's proprietary information, Bayer AG and Hennecke Germany introduced a new machine trademarked "HiproTec S" to manufacture shoe soles in 1998. The HiproTec S and PDI's FMS III processing system possessed similarities. The HiproTec S employs "out-sole filling technology" and Bayer AG markets the HiproTec S technology to footwear manufacturers as a "novel" "high performance" manufacturing process capable of doubling output.

**C.     Litigation**

PDI instituted the present action on August 11, 1999 and brought claims for civil RICO, fraud, negligent misrepresentation, theft of trade secrets, breach of fiduciary duty, breach of the disclosure agreement and unfair competition.  Upon reviewing Bayer's Motion to Dismiss, Judge Waldman dismissed the breach of fiduciary duty claim.  On October 23, 2003, this Court granted Summary Judgment as to the RICO claim.  After further discovery and several motions filed by the parties, on May 9, 2005 the case went to trial on the remaining counts.  At the end of PDI's case-in-chief, the Court dismissed the claims for breach of the disclosure agreement, theft of trade secrets and unfair competition pursuant to FED. R. CIV. P. 50(a).  The case went to the jury on the fraud, negligent misrepresentation and breach of contract claims after testimony was completed.  The jury returned verdicts in favor of PDI on both the negligent misrepresentation and the breach of contract claims and awarded PDI $12,500,261.00 in damages.  The Court entered the judgment on June 30, 2005.  Thereafter, the parties moved for extensions of time to file post-trial motions.  The Court granted the motions for extension, giving the parties until August 31, 2005.  (Doc. 278.)

**D.     Post-Trial Events**

Immediately after the trial concluded, William Peoples, President of Polymer Dynamics, spoke to the jurors about the verdict.  (Show Cause Hearing 5.)  Shortly thereafter, Mr. Peoples looked for the jurors' contact information online and subsequently met with Jurors No. 2 and 9. (Peoples Aff. ¶¶ 3-6, 9.)  He also unsuccessfully attempted to contact Juror No. 11 by telephone. (Id.)  In total, Plaintiffs secured the affidavits of four jurors, whose affidavits are attached to Polymer's Post-Trial Motion.  (Pl.'s Post Trial Mot. Exs. A-D.)

However, Mr. Peoples's stated that during the course of his conversations with the jurors,

he was told that Juror No. 5 had made negative and conclusive statements about PDI before the case was submitted to the jury. (Peoples Aff. 2.) Mr. Peoples then attempted, but was unable to reach, Juror No. 5 by calling her at Unisys, where she is employed as Director of Corporate Security for 450 Unisys facilities around the world. (Show Cause Hearing 11; Peoples Aff. 2; Ex. H to Peoples Aff.)

Plaintiff maintains that Unisys supplied IT services for Bayer Agfa and Roche, which became a division of Bayer as of 2003, and also that Juror No. 5 failed to indicate previous involvement in other litigation on her *voir dire*.   (Show Cause Hearing 3, 12, 18; Aff. of Peoples 4-5.)  Therefore, Plaintiff served a subpoena on Juror No. 5 on September 6, 2005 to produce certain documents, computer records and information. (Id.) However, both the general counsel for Unisys Corporation and Defendant's counsel stated that Juror No. 5 did not know of Unisys's involvement with Roche or Bayer nor did Juror No. 5 do anything improper during the course of the trial or jury deliberations. (Show Cause Hearing 21-23.) Juror No. 5 submitted an affidavit in which she stated that she had no knowledge of Unisys's relationship with other companies.  (Id.)

On August 12, 2005, Plaintiff filed a Supplement to its Post-Trial Motion because of the information learned regarding Juror No. 5. (Doc. 286.) Defendant Bayer filed an Answer and Cross-Motion to Preclude Plaintiff's Assertion of Additional Grounds on August 28, 2005.  (Doc. 287.) Plaintiff filed a Response on September 12, 2005. (Doc. 294.) On September 15, 2005, this Court held a Hearing to Show Cause why a subpoena delivered to Juror No. 5 should not be quashed. (Doc. 296.)  This Court granted the Motion to Quash finding that there had been no proof of illegality and Plaintiff had not made a showing that warranted violating the sanctity of jury deliberations. Id. at 35.

## II.   POLYMER'S MOTION FOR A NEW TRIAL

### A.   Legal Standard

A court may grant a new trial "for any of the reasons which new trials have heretofore been granted." FED. R. CIV. P. 59(a).  Generally, a court will order a new trial: (1) when the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) when improper conduct by an attorney or the court unfairly influenced the verdict; (3) when the jury verdict was facially inconsistent; or (4) where a verdict is so grossly excessive or inadequate "as to shock the conscience." Suarez v. Mattingly, 212 F. Supp. 2d 350, 352 (D.N.J. 2002) (citations omitted).  Determining whether to grant a new trial is within the sound discretion of the trial court. Wagner v. Fair Acres Geriatric Ctr, 49 F.3d 1002, 1017 (3d Cir. 1995).

### B.   Discussion

Polymer's Motion contends that there were three major defects in the parties' seven week trial.  First, Polymer claims that it was denied a fair trial due to the alleged misconduct of one of the jurors. (Pl. Supp. Post-Trial Mot. 1-3.)  Secondly, Polymer submits that the jury failed to find fraud due to the language in one of the jury interrogatories. (Pl. Post-Trial Mot. 9-11.)  Polymer's tertiary claim argues that the jury did not award it loss of profit damages because the Court did give an instruction on "failure of exclusive remedy." (Pl. Post-Trial Mot. 14.)  The Court will consider each one of Polymer's arguments in turn.

#### 1.   Alleged Juror Misconduct

Polymer's first argument centers on its claim of alleged juror misconduct.  In raising this issue, Polymer questions the impartiality of Juror No. 5.  Polymer claims that Juror No. 5 was biased in favor of Bayer during the trial because of a professional connection between Bayer and Juror No.

5's employer. (Pl. Supp. Post-Trial Mot. 5-8.).  Polymer claims that this bias affected Juror No. 5's

conduct during deliberations.  (Id. at 7.)  Bayer counters that Polymer has waived the right to raise

this issue at this point because it did not present it within the ten (10) days required by FED. R. CIV.

P. 59(b). (Def. Cross Mot. to Preclude 5.)  Bayer also disputes that Juror No. 5 withheld any material

information during *voir dire* and therefore, Polymer would have had no reason to challenge her for

cause.  (Id. at 3.)  Additionally, Bayer points out that Polymer has not shown the Court that Juror No.

5 behaved inappropriately during jury deliberations.  Id. at 7.  After a careful review of the facts and

the applicable law, this Court finds that Polymer waived its right to argue juror bias, but it timely

raised its argument as to juror misconduct resulting in an extraneous influence.

**a.     Waiver[1]**

Initially, the Court must address the procedural issue of whether the subject of juror

misconduct is properly before this Court.  Bayer contends that the issue of Juror No. 5's alleged

improper conduct is not properly before the Court as Polymer waived the issue by not raising it

within ten (10) days of the entry of final judgment as required by FED. R. CIV. P. 59(b). (Def. Cross

Mot. To Preclude Pl. Supp. 8-12.)  Bayer claims that because Juror No. 5's employer's relationship

with Bayer is a new argument, it cannot be included in this motion for post-trial relief, and the Court

does not have jurisdiction to consider it.  (Id. at 12.)  Polymer counters that the "extraneous

influence" referenced in paragraphs 10 & 16(c) of its original motion, included the conduct of Juror

5.  (Pl. Ans. to Def.'s Cross Mot. 5.)

In the Third Circuit, a district court is without authority to grant a new trial for reasons raised

by a party after the mandatory 10-day period under Rule 59(b).  Arkwright Mut. Ins. Co. v. Phila.

_____

[1] Although the Court denied Bayer's Cross-Motion on May 31, 2006 (Doc. 307), the Court will address the waiver argument in greater detail here.

Elec. Co., 427 F.2d 1273, 1276 (3d Cir. 1970).  This requirement is jurisdictional and cannot be

waived by the district court considering a motion for a new trial filed more than ten (10) days after

the entry of judgment.  Lee v. Consol. Rail Corp., No. 94-6411, 1995 U.S. Dist. LEXIS 18199, *8-9

(E.D. Pa. Dec. 5, 1995).  District courts in this Circuit have consistently followed the rule in

Arkwright, refusing to allow a party to support Rule 59(b) motions with issues raised outside of the

rule's ten (10) day requirement.  See, e.g., Rock v. AMTRAK, No. 04-1434, 2005 U.S. Dist. LEXIS

16268 * 33 (E.D. Pa. Aug. 9, 2005) ("[t]his Court may not grant a new trial for reasons articulated

subsequent to Rule 59's 10-day time limit."); Murtha v. Forest Elec. Corp., No. 90-3259, 1992 U.S.

Dist. LEXIS 10476, *32-33 (E.D. Pa. July 15, 1992) ("[u]nder the Third Circuit's interpretation of

Rule 59(b), all grounds offered in support of a motion for a new trial must be specifically noted in

a motion filed within ten days after entry of judgment").  In rare cases, a party may overcome the ten

day requirement if it establishes to the Court extraordinary circumstances that would allow

consideration under FED. R. CIV. P. 60(b)(6).[2]  See Arkwright, 427 F.2d at 1276.

---

[2] Alternatively, Polymer contends that the Court may consider the motion under FED. R. CIV. P. 60(b). (Pl.'s Mem. Opp. Def.'s Cross Mot. 4-5.)  Polymer asserts that their motion is timely under Rule 60(b)(6), which states that a motion for relief from judgment may be filed within a reasonable time after entry of a final judgment for any "other reason justifying relief from the operation of the judgment."  Plaintiff maintains that the alleged juror misconduct constitutes extraordinary circumstances.

The Supreme Court has held that justification of relief under Rule 60(b)(6) requires proof of "extraordinary circumstances, suggesting that the party is faultless in the delay." Pioneer Inv. Servs. v. Bruswick Assocs. P'ship., 507 U.S. 380, 393 (1993) (citing Ackerman v. United States, 340 U.S. 193, 197-200 (1950); Klapprott v. United States, 335 U.S. 601, 613-614 (1949) (finding that the petitioner proved extraordinary circumstances where he was prevented from making a timely appeal of judgment for four years because of incarceration, ill health and other factors beyond his reasonable control).  Further, the Third Circuit requires proof of extraordinary circumstances before relief from judgment will be granted.  See Arkwright Mut. Ins. Co. v. Philadelphia Elec. Co., 427 F.3d 1273, 1275-1276 (denying permission to appellants to file with additional reasons for a new trial nearly two years after the 10 days had passed because they did not present extraordinary circumstances under Rule 60(b)(6)); Coltec Indus. v. Hobgood, 280 F.3d 262, 275-276 (3d Cir. 2002) (denying 60(b)(6) relief where the moving party had negotiated away its constitutional claims while represented by competent counsel and the opposing party would be prejudiced). See also Wilson v. Fenton, 684 F.2d 249, 251 (3d Cir. 1982).  Accordingly, this Court rejects Polymer's argument because it has not shown that there are extraordinary circumstances such that relief under Rule 60(b)(6) is warranted.

Polymer's briefs reflect two arguments regarding Juror No. 5. The first argument pertains to Juror No. 5's alleged bias in favor of Defendant Bayer. Polymer believes that the mere fact that Juror No. 5's employer had a business relationship with Defendant Bayer renders her partial to Bayer. The second argument pertains to Juror No. 5's conduct during jury deliberations. Specifically, Polymer claims that Juror No. 5's conduct extraneously influenced the verdict. In both its Motion to Preclude and Response in Opposition to Polymer's Motion, Bayer submits that both arguments are improperly before the Court. This Court finds that Polymer may raise the conduct arguments under FED. R. CIV. P. 59(a), but not the actual bias arguments.[3]

Juror bias and extraneous influence are distinct arguments. The juror bias argument pertains specifically to Juror No. 5's alleged business relationship with the Defendant. That is information that was neither mentioned nor referred to by the Plaintiff in the Post Trial Motion. Further, Juror No. 5 is not discussed in any of the jurors' affidavits that are attached to Plaintiff's Post Trial Motion. (See Pl.'s Post Trial Mot., Exs. A-D.) Without mentioning Juror No. 5, there can be no juror bias argument. However, the extraneous influence argument is specifically stated in the Post-Trial Motion. (Pl.'s Post Trial Mot. ¶¶ 10-11.) Although there are few details, this argument can

---

[3] The Court denied Bayer's, August 29, 2005, motion to strike since Bayer's position, that "this Court lacks authority to order a new trial for the reasons proposed in [Polymer's] Supplement," (Def.'s Cross Mem. at ¶¶ 11, 12), is not a fair representation of the items contained in Polymer's Supplement. Rather, Polymer makes one argument in its Supplement that is consistent with the extraneous information challenge it raised in its Post Trial Motion. (See Pl.'s Supp. Mem. at ¶ 7, Ex. 2, ¶¶ 11, 13.) Polymer argues that Juror No. 5 brought in extraneous information to the jury (Pl.'s Supp. Mem. at ¶ 7), and in its Post Trial Motion, Polymer alleges that "through some external mechanism, an extraneous element for fraud was brought improperly into the jury deliberations." (Pl.'s Post Trial Mot. ¶ 10, 11). Therefore, all of Polymer's extraneous influence arguments were indeed timely.

While the Court is in no way endorsing the content of the supplement, it does recognize that the extraneous information accusation is timely having been raised no later than ten (10) days after entry of judgment. See Arkwright, 427 F.2d 1273, 1275-1276 (3d Cir. 1970). Further, because the extraneous influence argument is not a new ground, the situation is factually distinct from those where the Court has denied amendments to post trial motions based on additional grounds. See Maylie v. Nat. R.R. Passenger Corp., 791 F. Supp. 477, 480 (E.D. Pa. 1992), aff'd 983 F.2d 1051 (3d Cir. 1992); Larsen v. IBM Corp., 87 F.R.D. 602, 605 (E.D. Pa. 1980); Smith v. Pressed Steel Tank, 66 F.R.D. 429, 431 (E.D. Pa. 1975), aff'd 524 F.2d 1404 (3d Cir. 1975).

10

be cognizable without stating the exact nature of the extraneous influence. As such, Plaintiff made only the extraneous influence argument with enough specificity to warrant review by this Court.

**b.     Juror No. 5's Conduct as an Extraneous Influence on Jury Deliberations**

The Court now turns to the only timely matter relating to Juror No. 5 – the issue of Juror No. 5's conduct during deliberations. Polymer maintains that Juror No. 5's bias in favor of Bayer inserted an extraneous influence on jury deliberations that resulted in the jury applying an incorrect standard, and therefore it is entitled to a new trial under FED. R. CIV. P. 59(b). (Pl.'s Mem. Opp to Def.'s Cross Mot. 2-4.) However, this Court denies Plaintiff's Motion concerning extraneous influence because Plaintiff has not presented sufficient evidence.

The Third Circuit has held that, "it is fundamental that every litigant who is entitled to trial by jury is entitled to an impartial jury, free to the furthest extent practicable from extraneous influences that may subvert the fact-finding process." Waldorf v. Shuta, 3 F.3d 705, 709 (3d Cir. 1993). In ensuring that this right is upheld, it is generally accepted that jurors must not engage in "discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body." United States v. Bertoli, 40 F.3d 1384, 1393 (3d Cir. 1994), cert. denied, 517 U.S. 1137 (1996) (quoting United States v. Resko, 3 F.3d 684, 688 (3d Cir. 1993)). However, "the losing party cannot, in order to secure a new trial, use the testimony of jurors to impeach their verdict." McDonald v. Pless, 238 U.S. 264, 269 (1915). See United States v. Stansfield, 101 F.3d 909, 915 (3d Cir. 1996)

Courts are very protective of jury deliberations, and generally will not invade their sanctity. In furtherance of this notion, FED. R. EVID. 606(b) provides that:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about: 1) whether extraneous prejudicial information was improperly brought to the jury's attention; 2) whether any outside influence was improperly brought to bear upon any juror; or 3) whether there was any mistake in entering the verdict onto the verdict form.

For purposes of this analysis, the first two exceptions are at issue. Rule 606 does allow for inquiry into the validity of a verdict if extraneous prejudicial information has been improperly brought to the jury's attention or when outside influence has been improperly brought to bear upon any juror. FED. R. EVID. 606(b).

Extraneous information has been found to include: 1) information publicly received and discussed inside the jury room; 2) consideration by the jury of evidence not admitted in court; and 3) communications or other contact between jurors and third persons, including contacts with the trial judge outside the presence of the defendant and counsel. Virgin Islands v. Gereau, 523 F.2d 140, 149 (3d Cir. 1975) (citations omitted). Outside influences are limited to only those influences outside the evidence presented at trial, such as prejudicial publicity, pressure placed on jurors from outside sources, or use of extrajudicial information. Marcavage v. Bd. of Trustees of Temple Univ., 400 F. Supp. 2d 801, 806 (E.D. Pa. 2005) (citing Tanner v. United States, 483 U.S. 107 (1987) (finding that juror intoxication is not an outside influence)).

Polymer has not submitted any evidence that Juror No. 5's conduct falls within any of those categories. Rather, Plaintiff is alleging intra-jury communications in that Juror No. 5 may have made statements to the other jurors, not that there was any extraneous influence, e.g. learning of

12

prior misconduct of the defendant through the newspaper.  The Third Circuit has held that "evidence of discussions among jurors, intimidation or harassment of one juror by another and other intra-jury influences on the verdict . . . is not competent to impeach a verdict."  Gereau, 523 F.2d at 149-150.  Further, in cases of intra-jury communications, there is no presumption of prejudice and "no reason to doubt that the jury based its decision only based on evidence formally presented at trial."  Bertoli, 40 F.3d at 1394 (quoting Resko, 3 F.3d at 690).  In Bertoli, after learning of premature deliberations, the court conducted a *voir dire* of the jurors, and determined that the deliberations did not prejudice the defendant.  40 F.3d at 1395.

Further, allegations of juror misconduct do not necessarily permit deviating from the bar on impeachment in FED. R. EVID. 606.  In United States v. Richards, 241 F.3d 335, 344 (3d Cir. 2001), the defendant moved for a new trial based on allegations that the jury foreman was a friend of the government's witness and did not honestly disclose the relationship during *voir dire*.  However, the district court, upon reviewing the *voir dire* transcript, determined that the juror did not withhold any relevant information.  Id.  Similarly, this Court conducted a Show Cause Hearing concerning the Subpoena for Juror No. 5, and determined that the Plaintiffs had not made a showing that warranted further inquiry into the alleged juror misconduct and quashed the subpoena. (Show Cause Hearing 21-23.)

Finally, this is the very inquiry that Rule 606(b) was created to prevent.  United States v. Lloyd, 269 F.3d 228, 237 (3d Cir. 2001) ("we do not permit jurors to impeach their own verdicts [because] 'if . . . courts were to permit a lone juror to attack a verdict through an open-ended narrative concerning the thoughts, views, statements, feelings, and biases of herself and all other jurors sharing in that verdict, the integrity of the American jury system would suffer irreparably.'")

13

Rather, jurors who complete their service should rarely, if at all, be recalled for post-trial proceedings concerning their decisions.  United States v. Gilsenan, 949 F.2d 90, 98 (3d Cir. 1991) "It is a qualitatively different thing to conduct a *voir dire* during an ongoing proceeding at which the jury is part of the adjudicative process than to recall a jury months or years later for that purpose." Id.  The Supreme Court has indicated that there are strong public policy reasons that militate against post-verdict investigations into juror misconduct, stating:  "Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process." Tanner, 483 U.S. at 120 (1987).  Further, "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of lay people would all be undermined by a barrage of post-verdict scrutiny of juror conduct." Id.

A decision for Polymer in this regard would ignore well-settled law regarding extraneous and outside influences.  Therefore, this Court denies Plaintiff's Post Trial Motion as to Juror Misconduct.

c.    **Juror No. 5's  Alleged Bias**

Having already determined that Polymer waived the opportunity to raise Juror No. 5's alleged bias  as a ground for a new trial, the Court need not consider this argument.  However, for the purpose of clarity and due to Polymer's patent misstatement of the law, the Court will address Polymer's juror bias claim on its merits.

Without any proof or knowledge of any affect on the deliberative process, Polymer accuses Juror No. 5 of bias merely because Juror No. 5's employer has a business relationship

with Defendant Bayer. (Pl.'s Supp. Post Trial Mot. 2.)  Polymer further alleges that Juror No. 5

was untruthful in failing to disclose this business relationship during *voir dire*. (Id.)

   The weakness of Polymer's argument is undeniable after a review of the case law on

juror bias.  In order to ensure that all litigants receive fair trials, courts may grant a new trial if a

party presents admissible evidence of juror bias.  McDonough Power Equip., Inc. v. Greenwood,

464 U.S. 548, 554 (1984).  The Supreme Court has long held that a fair trial necessarily includes

an impartial trier of fact; a jury willing and able to decide a case based solely on the

evidence admitted at trial.  Id. at 554.  The right to an impartial jury is protected by the *voir dire*

examination, which is intended to expose potential biases.  Id.  An inquiry into whether a juror

lied during the *voir dire* questioning may necessitate a new trial, but the moving party must

show that the juror failed to answer honestly a material question and then show that a truthful

response would have provided a valid basis for a challenge for cause.  Id. at 557.   In other

words, the moving party must establish that the juror in question in fact lied and that it was

material.  A court will not invalidate a jury verdict because of a juror's "mistaken, though

honest" response to a *voir dire* question.  United States v. Hodge, 321 F.3d 429, 441 (3d Cir.

2003) (quoting McDonough Power, 464 U.S. at 555); see also United States v. Holck, 398 F.

Supp. 2d 338 (E.D. Pa. 2005) (refusing to grant a new trial because a juror's failure to disclose a

part-time occupation during *voir dire* was not intentional).  The allegations in Polymer's brief

do not meet the McDonough Power standard.

   Polymer cannot establish the threshold issue of whether Juror No. 5 actually withheld

material information during *voir dire*.  Polymer did not submit evidence to prove that Juror No.

5 actually knew about the relationship in question.  Plaintiff simply argues that Juror No. 5 "*had*

to be aware of the relationship between Unisys and Bayer." (Pl.'s Post Trial Mem. 7, emphasis

added.)  In an attempt to fill in the holes in its logic, Polymer uses Juror No. 5's reaction to Mr.

Peoples's phone calls as "proof" of bias.  However, Polymer's contentions do not provide a

basis for a new trial.  Mr. Peoples left two messages at Juror No. 5's place of business.  Simply

because Juror No. 5 wanted this conduct to stop, and contacted the Court to ask for assistance,

Polymer calls her reaction bizarre. (Pl.'s Post Trial Mem. 5.)  To the contrary, there is nothing

bizarre about wanting to maintain one's privacy.  Jurors were advised that their deliberations are

private and they would never have to explain their verdict to anyone.  (Jury Instruction 48.)

Polymer's speculation and accusations to the contrary cannot substitute for the requisite facts

and legal reasoning necessary to justify a new trial.

### 2.    Alleged Error in Juror Interrogatories on Polymer's Fraud Claim.

Polymer further argues that it is entitled to a new trial on its fraud claim due to an error

in the jury interrogatories.  Polymer does not contend that the Court improperly instructed the

jury on fraud.  Instead, Polymer submits that the third element of fraud, which requires a

misrepresentation be made knowingly or with reckless disregard for the truth, was not properly

represented in the Jury Interrogatories.  Interrogatory No. 2 asked whether Polymer "proved by

clear and convincing evidence that . . . Bayer knowingly made false misrepresentations."

Polymer concludes that this was plain error, requiring the Court to grant a new trial on the issue

of fraud. However, Bayer submits that the Court may not consider affidavits by jurors pursuant

to FED R. EVID. 606.  Bayer states that even if the Court could consider such evidence, Polymer

waived its right seek a new trial based on the wording of Interrogatory No. 2 because its

16

attorneys never objected to it at trial.  Moreover, Bayer continues, any error would be harmless because the Court properly instructed the jury on the elements of fraud.  The Court agrees, therefore, it will deny the Motion for a New Trial on the basis of the Jury Interrogatories.

**a. The Court's Consideration of Juror Affidavits**

The first deficiency in Polymer's Jury Interrogatory argument is its reliance on juror affidavits to make the point that certain jurors potentially misunderstood the definition of fraud given by the Court.  As discussed, FED. R. EVID. 606(b) provides that "upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations" or "to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith."  Rule 606(b) promotes the integrity of the jury system by: "(1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and open discussion among jurors; (3) reducing incentives for jury tampering; (4) promoting verdict finality; and (5) maintaining the viability of the jury as a judicial decision-making body."  Stansfield, 101 F.3d at 915.  Further, a "jury's verdict may not be impeached by the testimony of a juror concerning any influences on the jury's deliberations that emanated from within the jury room."  Id. at 913.

As such, neither of the 606(b) exceptions for extraneous information or outside influence apply to the affidavits that Polymer relies upon for this particular challenge to the fraud verdict.  The affidavits submitted by Polymer do not support a finding that the jury's verdict was affected by any extraneous information or outside influences; they only attempt to explain the jurors

17

alleged misunderstanding of the definition of fraud.  Again, this is the very inquiry that Rule

606(b) was created to prevent.  Lloyd, 269 F.3d at 237.  Because FED. R. EVID. 606(b) prevents

the Court from considering any of the statements contained in the affidavits obtained by

Polymer, its Motion is denied.

The Court must further stress the patent impropriety of Plaintiff's actions.  Through its

contact with jurors following trial and its harassment of Juror No. 5, Plaintiff abused its

opportunity to speak with jurors.  Plaintiff's flagrant conduct not only undermines Rule 606(b)

but also foils the viability of the jury as a judicial decision-making body.  While this Court is not

inclined at present to issue sanctions, Plaintiff must be made aware that this Court finds

Plaintiff's conduct abhorrent.

**b. Polymer's Waiver of Objections to Interrogatories**

Even if the Court could consider the information contained in the Juror's affidavits,

Polymer's Motion must still be denied because it waived the right to object to the Jury

Interrogatories at trial.  The Federal Rules of Civil Procedure ensure that all parties have the

right to make objections on the record regarding both instructions and verdict sheets given to

jurors.  See FED. R. CIV. P. 51(c).  A party must make timely objections to both the form and the

language of verdict forms before the jury retires to deliberations.  Neely v. Club Med Mgmt.

Servs., 63 F.3d 166, 200 (3d Cir. 1995).  However, failure to object to a proposed verdict sheet

at the time the jury received the sheet constitutes a waiver of this objection.  Inter Med.

Supplies, Ltd. v. Ebi Med. Sys., 181 F.3d 446, 463 (3d Cir. 1999).

The Court gave both parties ample time to object to both the instructions and the interrogatories; yet, Polymer did not object to any alleged problems or inconsistences with Jury Interrogatory No. 2.  Indeed, Polymer's proposed jury instructions and interrogatories only contained the word "reckless" in the context of punitive damages.  On the morning of June 22, 2005, the Court gave both parties copies of the Jury Instructions and the Jury Interrogatories. (N.T. 6/22/05 at 3.)  Polymer's attorneys made objections to the instructions, and the Court considered all of its arguments.[4]  (N.T. 6/22/05 at 3-16.)  However, the only mention of reckless conduct was  following an objection raised by Bayer and related to awarding punitive damages for negligent misrepresentation versus fraud.  (N.T. 6/22/05 at 18-19.)

Polymer's attorneys were present during the charging of the jury.  Following the charge, the Court gave Polymer additional time to make any objections at sidebar.  (N.T. 6/22/05 at 66.) Polymer still did not object to Jury Interrogatory No. 2.  The jury in this case deliberated for two days.  At no time during those deliberations did Polymer notify the Court of any problem or inconsistency with the Jury  Interrogatories.  Therefore, Polymer has waived its right to object to any of the Jury  Interrogatories.

**c. The Plain Error Doctrine**

Because Polymer did not make a timely objection to Jury Interrogatory No. 2, the Court may only grant a new trial if Polymer proves that the Court's actions rise to the level of "plain error."  See Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 123-124 (3d Cir. 1999), cert. denied, 528 U.S. 1074 (2000).  However, the Court must deny Polymer's Motion on the merits

---

[4] Polymer objected to the jury instructions relating to notice or knowledge, failure to produce available evidence, concealment and non-disclosure.  (N.T. 6/22/05 at 3-4.)

19

because it has not shown that the use of Jury Interrogatory No. 2 resulted in plain error.

It is axiomatic that although all litigants are entitled to a fair trial, they are not entitled to a perfect trial. See McQueeney v. Wilmington Trust Co., 779 F.2d 916, 927 (3d Cir. 1985) (finding that the goal for trials should be perfection, but the harmless error rule, which requires reversal only where the error is inconsistent with substantial justice, is justified to avoid wasting the time and effort of the judge, counsel and other trial participants). Accordingly, "no error or defect in any ruling or order or in anything done or omitted by the court . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice." FED. R. CIV. P. 61. "The court . . . must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Id.

The plain error determination is left to the sole discretion of the Court, and should be exercised sparingly. Hurley, 174 F.3d at 123; Watson v. SEPTA, 207 F.3d 207, 222 (3d Cir. 2000), cert. denied, 531 U.S. 1147 (2001). It is the burden of the moving party to establish plain error. United States v. Guadalupe, 402 F. 3d 409, 410 (3d Cir. 2005), cert. denied, 126 S. Ct. 1909 (2006); see United States v. Olano, 507 U.S. 725, 734-735 (1993). If the party establishes that: (1) the Court erred; (2) the error was obvious under the law at the time of review; and (3) the error (if any) affected the substantial right, i.e., the outcome of the proceeding, then the Court may grant the moving party's motion. Guadalupe, 402 F.3d at 410. However, the court should only exercise its discretion and grant relief "if the error affects the fairness, integrity or public perception of the proceeding." Id. In the case of an erroneous jury instruction, the court should "notice the error only if it is fundamental and highly prejudicial or if the instructions are

20

such that the jury is without adequate guidance on a fundamental question and [the court's] failure to consider the error would result in a miscarriage of justice." Hurley, 174 F.3d at 123-24 (quoting Fashauer v. New Jersey Transit Rail Operations, Inc. 57 F.3d 1269, 1289 (3d Cir. 1995)).

Further, "interrogatories must not be read in isolation, but together with the entire charge." United States v. Desmond, 670 F.2d 414, 418 (3d Cir. 1982). In Desmond, a homicide case, the interrogatories did not specifically set out evidence of character as a consideration separate from willfulness, but the jury instructions did. Id. The court did not find plain error because the jury logically would have voted "no" on the question of willfulness if it believed the defendant was not the kind of person who would have the intent to commit the homicide. Id. at 419. And, in general, courts must assume "that the jury understood and followed the court's instructions." Rinehimer v. Cemcolift, 292 F.3d 375, 383 (3d Cir. 2002) (quoting Loughman v. Consol-Pennsylvania Coal Co., 6 F.3d 88, 105 (3d Cir. 1993)); see Shannon v. United States, 512 U.S. 573, 585 (1994) (it is an "almost invariable assumption of the law that jurors follow their instructions") (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1982)).

Polymer has not offered any evidence to show that there was plain error. Rather, Polymer specifically states that the jury instructions listed all the elements of fraud and that the Court properly instructed the jury. (Pl.'s Post-Trial Mem. 15, 19; NT 6/22/05 at 55-56.) It is undisputed that Polymer did not object at the time the instructions were given. The Court provided the jury with a written copy of the Jury Instructions to be used during deliberations. (N.T. 6/22/05 at 30-32.) During deliberations, the jury sought additional instruction on the question of fraud, and the Court again properly instructed them. (N.T. 6/23/05 at 4-5.) Thus,

21

the jury was provided with all necessary tools for deliberation.  See Desmond, 670 F.2d at 416,

418-419 (jury sought additional instruction on the subject of willfulness.  The court found that

the jury had *both* the interrogatories and instructions, and therefore were not misled) (emphasis

added).

Even if Polymer could establish an error was committed, it has not shown that such error

was fundamental, highly prejudicial or would result in a miscarriage of justice.  Cf. Beardshall

v. Minuteman Press Int'l, 664 F.2d 23, 26-27 (3d Cir. 1981) (finding plain error where the trial

court charged the jury to find fraud by a preponderance rather than the correct standard of clear

and convincing).  Nor has Polymer shown that such an error affected the fairness, integrity or

public perception of the proceeding.  See Guadalupe, 402 F.3d at 410.

Furthermore Polymer's cited cases can be distinguished from the instant case.  In Petes

v. Hayes, 664 F.2d 523, 526 (5th Cir. 1981), the court found that where there is a discrepancy

between the jury interrogatories and the instructions that is so very likely to mislead or confuse

the jury, then the court will find reversible error.  First, Petes is not precedential.  Unlike this

case, the plaintiff in Petes objected to the relevant jury interrogatory, thus that court never even

reached a plain error analysis.  Morever, the Polymer jury sought clarification from the Court.

Having heard the instruction two times, the Court can presume that the jury confirmed their

understanding of the correct standard and then proceeded to apply it properly.  See Flamer v.

Delaware, 68 F.3d 736, 752 (3d Cir. 1995) (presuming that the jury applied the proper standard

where it was "expressly, clearly and repeatedly instructed, both orally and in writing," and that if

there were a conflict between the instructions and an interrogatory, the reasonable thing for a

jury to do is seek clarification from the judge).

22

Similarly, Polymer cites <u>Stemler v. Burke</u>, 344 F.2d 393 (6th Cir. 1965), which is a Sixth Circuit case dealing with a proximate cause jury interrogatory. In <u>Stemler</u>, plaintiffs submitted a properly worded interrogatory and objected before deliberations. <u>Id.</u> at 397. As such, the Sixth Circuit did not review for plain error. Polymer also cites <u>Grace v. Bd. of Trustees for State Colleges and Univ.</u>, No. 84-414A, 1991 U.S. Dist. LEXIS 20204 (M.D. La. April 27, 1992), which is also non-precedential. Moreover, there is no plain error analysis in <u>Grace</u> because the defendants requested an interrogatory and then objected to the court's decision not to use the interrogatory. <u>Id.</u> Similarly, in <u>Saunders v. Rhode Island</u>, 731 F.2d 81, 84-85 (1st Cir. 1984), the court did not reach a plain error analysis because the defendant did not have a reason to object to the instructions until long after the trial when the state Supreme Court issued a series of rulings that provided the basis for the objection. <u>Schaafsma v. Morin Vermont Corp.</u>, 802 F.2d 629 (1st Cir. 1986), can also be distinguished from this case. There, the First Circuit found that the district court erred in both the jury instructions and the interrogatories. <u>Id.</u> at 637. The court held that there was plain error because it was prejudicial to the plaintiffs, in that the jury may have decided differently, which would allow plaintiffs to reach solvent defendants for damages. <u>Id.</u> In the instant case, not only were the jury instructions correct, the court clarified any discrepancy between the instructions and the interrogatories. Further confirming, if assuming that there was an error here, it was not prejudicial.

Polymer has not shown that there was plain error that was highly prejudicial or resulted in a miscarriage of justice. The Court properly instructed the jury and further explained its instructions during deliberations. Therefore, this Court denies Plaintiff's Motion on the basis of Jury Interrogatory No. 2.

23

### 3. Breach of Contract and Negligent Misrepresentation Claims

Polymer's next attempt at a new trial centers around its breach of contract and negligent misrepresentation claims. At trial, Polymer claimed that Bayer breached the contract between the parties because the equipment it purchased from Bayer did not perform up to expectations. (See Pl.'s Post Trial Mem. at 19-20.) Polymer's theory was that it was entitled to consequential damages, specifically lost profits, due to the defects in the machines. The jury disagreed with Polymer. Polymer now asserts Court error based on the jury's decision.

Two days before the completion of the trial, Polymer submitted to the Court two proposed instructions regarding failure of exclusive remedy.[5] (Pl.'s Proposed Jury Instructions,

---

[5] **Plaintiff Requested Jury Charge No. 23: Failure of Exclusive Remedy:**
Defendant Bayer contends that PDI's remedy for breach of contract is limited by the warranty provisions that are set forth in the various Bayer proposals. If enforced, these warranty provisions would limit Bayer's liability to either repairing or replacing any "nonconforming Equipment" manufactured by Bayer or Hennecke. As to those parts of the equipment that were not manufactured by Bayer/Hennecke, these warranty provisions would limit PDI's remedies to whatever warranty Bayer obtained from the vendors of those pieces of equipment.
Further, Bayer contends that the limitation of liability provision set forth in the Bayer proposals should be enforced. If enforced, that provision would limit Bayer's liability for any breach of contract to those remedies set forth in the warranty provisions and would bar PDI from receiving damages for loss of profit, loss of operating time, loss or reduction in use of any facilities including existing facilities, increased expense or operation or maintenance cost or value of investment capital, or any other special, indirect, incidental, or consequential damages.
PDI contends that the exclusive and limited remedies set forth in the proposals were wholly inadequate to address the breaches of the contract and failures of the equipment alleged by PDI.
I instruct you that " where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in the [Uniform Commercial Code]. . . . That means that where an exclusive remedy fails, a buyer [such as PDI] may seek the entire range of remedies available under the [Uniform Commercial Code] . . . including consequential damages, if proven."
And so, if you find that the warranty and liability provisions of the proposals were part of the contract, but that the exclusive remedy offered by Bayer "failed of its essential purpose," then you may find that the limitation of liability provision is inoperable and you may award PDI whatever damages you find it has proven, including but not limited to, its lost profits.
Citing Caudill Seed and Warehouse Co, Inc. v. Prophet 21 Inc., 123 F. Supp. 2d 826, 831-32 (E.D. Pa. 2000).

**Plaintiff Requested Jury Charge No. 24:Failure of Exclusive Remedy – Deprivation of the Bargain**

dated 6/20/2005.) The Court refused to give the instructions. (NT 6/21/05 at 90-91; NT 6/22/05 at 14-29; NT 6/24/05 at 3-4.) According to Polymer, the Court erred by not giving the jury the failure of exclusive remedy charges because if the Court had given the charge, Polymer claims the jury would have been able to disregard the limitation of liability clause and award lost profits as additional damages. (Pl.'s Post Trial Mem. at 23.) Polymer further claims that the limitation of liability clause in the contract is unconscionable as a matter of law. (Id. at 28.) Considering Polymer's arguments in light of the Rule 59 standard, the Court will deny this Motion as well.

The parties agree that the present dispute is over a sale of goods in Pennsylvania, and therefore this Court must apply Pennsylvania's version of the Uniform Commercial Code, 13 PA. C.S.A. § 2719. (Pl.'s Post Trial Mem. 23; Def.'s Resp. 25.) As of the time of trial, the Supreme Court of Pennsylvania had not opined on the issue before this Court, (see Caudill Seed & Warehouse Co., Inc. v. Prophet 21, Inc., 123 F. Supp. 2d 826, 830-831 (E.D. Pa. 2000) (finding that neither the Supreme Court of Pennsylvania nor the Superior Court of Pennsylvania had held on the relationship between a limitation of liability clause and failure of exclusive remedy); (Pl.'s Post Trial Mem. 25), and as a result, this Court had to predict how the Supreme Court of Pennsylvania would rule on the issue of whether the failure of exclusive remedy would void a limitation of liability clause in a contract for a sale of goods. Id.[6]

---

An exclusive remedy fails of its essential purpose and may be deemed not effective if that remedy deprived the buyer of the substantial value of the bargain. Citing Stickler v. Peterbilt Motors Co., No 04-3628, 2005 U.S. Dist. LEXIS 10231, at *3-4 (E.D. Pa. May 27, 2005)(internal citations omitted).

[6] In a non-UCC context, the Pennsylvania Superior Court has recognized that "in a commercial setting, a contractual provision limiting warranties, establishing repair or replacement as the exclusive remedy and excluding liability for special, indirect and consequential damages is generally valid and enforceable." However, Pennsylvania courts have not reached the issue of whether the limitation on consequential damages stands when the exclusive

### a. Failure of Exclusive Remedy Instruction

The Pennsylvania Commercial Code provides that when a contract remedy fails in its essential purpose, "remedy may be had as provided in [the Code]." 13 PA. C.S.A. § 2719. According to Polymer, because the issue of whether a remedy has failed in its essential purpose is a jury question, the Court erred when it did not instruct the jury on how a potential failure of exclusive remedy would affect the limitation of liability clause. (Pl.'s Post Trial Mem. at 23 (citing <u>Smith v. Chrysler Motor Corp.</u>, No. 89-2898, 1990 U.S. Dist. LEXIS 5963 (E.D. Pa. May 15, 1990).) However, Polymer is mistaken. The Court's instructions were proper. The jury was not instructed on how a potential failure would affect the limitation of liability clause since Section 2719 does not mandate the conclusion posited by Polymer. That section does not

---

remedy fails. <u>Carll v. Terminix Int'l Co.</u>, 793 A.2d 921, 924-925 (Pa. Super 2002) (citing <u>New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.</u>, 387 Pa. Super 537, 564 A.2d 919 (1989)).

By letter dated, March 21, 2007, Plaintiff belatedly cites <u>Atwell v. Beckwith Machinery Co.</u>, 872 A.2d 1216, 1224 (Pa. Super. 2005), which found that the exclusive remedy clause deprived Atwell of the substantial value of its bargain "since repair or replacement of only those parts that are defective essentially provides Atwell with a Beckwith Rebuild and not the Caterpillar Rebuild the jury found Atwell agreed to purchase." Therefore, the Court held that it was proper to provide a remedy in accordance with the UCC, and award Atwell the difference at the time and place of acceptance between the value of the goods accepted and the value as warranted. <u>Id.</u> (citing 13 PA. C.S.A. § 2714).

However, <u>Atwell</u> is consistent with the language of Section 2719, comment 1, and does not specifically hold that the limitation on consequential damages clause necessarily fails. Rather, as the <u>Atwell</u> court noted, the trial court found that a remedy limitation is "applicable if the seller can repair or replace defective goods sold, but not where the seller has delivered a non-conforming machine of lesser value and quality than the seller had agreed to sell." <u>Id.</u> at 1223. The trial court also found the limitation on damages clause to be inoperable because it was not "sufficiently conspicuous." <u>Id.</u> However, plaintiff Atwell accepted the non-conforming goods, and therefore was only entitled to the benefit of their bargain. In effect, the Superior Court did not specifically find that when the exclusive remedy fails, it operates to negate the limitation on damages. Indeed, there is no discussion of Section 2719(c) - limitation on consequential damages. This is because there was no separate provision in the <u>Atwell</u> contract providing for the limitation of liability. <u>See Atwell</u>, 872 A.2d at 1224. In contrast, the limitation of liability provision in the PDI-Bayer contract stood alone. As such, <u>Atwell</u> is not controlling, and this Court is not obligated to consider it.

Further, it should be noted that long after the briefing had been filed, Polymer submitted <u>Atwell</u>, a case that was decided at least one month prior to trial. As such, <u>Atwell</u> presents no intervening change in the law that warrants this Court's consideration.

26

require a conclusion that if a limited remedy fails of its essential purpose, the contract provisions excluding consequential damages must also fail.

Polymer's "failure of exclusive remedy" proposed charge was improper because the limited remedy of repair and an exclusion of consequential damages are two independent ways of attempting to limit recovery for breach of warranty. <u>Chatlos Sys., Inc. v. Nat'l Cash Reg. Corp.</u>, 635 F. 2d 1081, 1086 (3d Cir. 1980), <u>cert</u>. <u>dismissed</u>, 457 U.S. 1112 (1982).[7] This was the prevailing interpretation in the Eastern District of Pennsylvania at the time of the trial, and, although in flux, it generally continues to be the consensus. <u>See, e.g.</u>, <u>Carter v. Exxon Co. USA</u>, 177 F.3d 197, 208 (3d Cir. 1999) (recognizing that the New Jersey Supreme Court adopted the reasoning in <u>Chatlos</u> by holding that the failure of seller's repair warranty of its essential purpose "does not alone render the disclaimer of consequential damages unconscionable."); <u>Northeastern Power Co. v. Balcke-Durr, Inc.</u>, No. 97-4836, 1999 U.S. Dist. LEXIS 13437, *54-55 (E.D. Pa. Aug. 23, 1999) (Van Antwerpen, J.) (finding in accordance with many other courts that the better reasoned approach is to treat the limitation on consequential damages under a consciability standard and independent of the failure of exclusive remedy clause); <u>Otobai, Inc. v. Auto Tell Servs.</u>, No. 93-2855, 1994 U.S. Dist. LEXIS 7592, *31-34 (E.D. Pa. May 31, 1994) (finding in accordance with <u>Chatlos</u> that the failure of an exclusive remedy and a limitation on consequential damages provisions are governed by two different standards such that the limitation on consequential damages fails only if it is unconscionable); <u>Factory Mkt. v. Schuller Int'l</u>, 987 F. Supp. 387 (E.D.

---

[7]   <u>Cf.</u>, In <u>Ragen Corp. v. Kearney & Trecker Corp.</u>, 912 F.2d 619, 624-25 (3d Cir. 1990) (the Third Circuit interpreted the Wisconsin Uniform Commercial Code and held that where the buyer's exclusive remedy of repair fails in its essential purpose, the buyer could recover consequential damages even though they were excluded under the contract. However, the court's decision was an explicit attempt to predict what the Wisconsin Supreme Court would hold, and in articulating its decision, the Third Circuit almost exclusively relied on previous Wisconsin state court decisions.)

Pa. 1997) (noting that the limited remedy of repair and consequential damages exclusion are two distinct ways of limiting damages for breach of warranty in the UCC context); see also Mextel Inc. v. Air Shields, Inc., No. 01-7308; 2005 WL 226112, *35 (E.D. Pa. Jan. 31, 2005) ("An unjustified breach of contract does not subject the breaching party to all remedies under contract law if the contract provides otherwise"); Hornberger v. Gen. Motors Corp., 929 F. Supp. 884, 890-891 (E.D. Pa. 1996) (reviewing the exclusive remedy and limitation of liability clauses separately). And, other Third Circuit districts courts held in accord. See, e.g., Mitsubishi Corp. v. Goldmark Plastic Compounds, 446 F. Supp. 2d 378, 385-386 (W.D. Pa. 2006) (interprets the limitation of liability clause as separate and subject to the unconscionability standard); Brown v. SAP America, Inc., No. 98-507, 1999 WL 803888, *8-10 (D. Del. Sept. 13, 1999) (interprets the limitation of liability clause as separate and subject to the unconscionability standard); Middletown Concrete Prods., Inc. v. Black Clawson Co., 802 F. Supp. 1135, 1152-1154 (D. Del. 1992) (applying Iowa law); Jim Dan, Inc. v. O.M. Scott & Sons Co., 785 F. Supp. 1196, 1200 (W.D. Pa. 1992); Werner & Pfleiderer Corp. v. Gary Chemical Corp., 697 F. Supp. 808, 812-813 (D.N.J. 1988).[8]

Further, in Chatlos, the Third Circuit held that the failure of exclusive remedy clause is treated as independent from a consequential damages disclaimer. 635 F.2d at 1086. As noted *supra* the court reasoned that these two clauses are simply "two discrete ways of attempting to limit

---

[8] Cf, Caudill Seed & Warehouse Co. v. Prophet 21, Inc., 123 F. Supp. 2d 826, 831-32 (E.D. Pa. 2000). (Judge Reed held that the failure of exclusive remedy clause and the limitation on liability provision are inextricably linked such that if the exclusive remedy fails, then consequential damages are available. 123 F. Supp. 2d at 831-832. Judge Reed reached the same conclusion in Amsan, LLC v. Prophet 21, Inc., No. 01-1950, 2001 U.S. Dist. LEXIS 16698, *7-8 (E.D. Pa. Oct. 15, 2001) and Werner Kammann Maschinenfabrik, GmbH v. Max Levy Autograph, No. 01-1083, 2002 U.S. Dist. LEXIS 1460, *10 (E.D. Pa. Jan. 31, 2002); see also Strickler v. Peterbilt Motors Co., No. 04-3628, 2005 U.S. Dist. LEXIS 10231, *10-12 (E.D. Pa. May 27, 2005) (Schiller, J.). Nonetheless, Judge Reed recognized that "district courts within the Third Circuit generally favor the Chatlos approach of enforcing damage disclaimers even when the exclusive remedy is found to have failed of its essential purpose." Caudill Seed, 123 F. Supp. 2d at 831.)

recovery for breach of warranty." Id. As such, the limited remedy of repair survives unless it fails of its essential purpose, but the consequential damages exclusion is valid unless it is unconscionable. Id. The court found that the parties were both sophisticated businesses who could competently agree upon the allocation of risk involved in the installation of the product at issue. Id. at 1087. Further, the type of damage that occurred was "within the realm of expectable losses." Id. As such, there was nothing "in the formation of the contract or the circumstances resulting in failure of performance that makes it unconscionable to enforce the parties' allocation of risk." Id. [9]

A textual analysis of Section 2719 also supports this Court's determination that the remedy and damages sections of 2719 are to be treated separately.[10] Section 2719 reads as follows:

> (a) General rule - Subject to the provisions of subsections (b) and (c) of section 2718 (relating to liquidation or limitation of damages; deposits):
>
> (1) The agreement may provide for remedies in addition to or in substitution for those provided in this division and may limit or alter the measure of damages recoverable under this division, as by limiting the remedies of the buyer to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts.
>
> (2) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
>
> (b) Exclusive remedy failing in purpose. Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.
>
> (c) Limitation of consequential damages. Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

---

[9] Chatlos was decided under the New Jersey Uniform Commercial Code; however, the provisions at issue are identical to those in the Pennsylvania Uniform Commercial Code. See Factory Mkt. v. Schuller Int'l, 987 F. Supp. 387, 399 n. 10 (E.D. Pa. 1997).

[10] The most thorough review of this issue is that of a case in the District of Minnesota in which the court is applying Pennsylvania law. Piper Jaffray & Co. v. SunGard Sys. Int'l, Inc., No. 04-2922, 2005 U.S. Dist. LEXIS 7497, *18-20 (D. Minn. April 28, 2005). This Court is persuaded by Judge Kyle's analysis.

First, subsection (a) provides two mechanisms by which parties can modify their agreement.  Parties may provide for remedies in addition to or in substitution for those provided in this division *and* may limit or alter the measure of damages recoverable under this division. 13 PA. C.S.A. § 2719(a)(emphasis added). The conjunction "and" indicates that the modification options are separate concepts that may be used alone or in combination with each other.  In other words, parties may choose to modify their agreement by altering a remedy, limiting damages, or by doing both. Piper Jaffray, 2005 U.S. Dist. LEXIS 7497, *18.  Nothing in the text supports Polymer's position that the survival of a limitation of damages provision was automatically conditioned upon the success of a substituted remedy.

The second textual point comes from subsections (b) and (c).   Polymer claims that subsection (b) entitles it to all the remedies under the UCC (including lost profits) when an exclusive remedy fails of its essential purpose. (See Pl.'s Post Trial Mem. 23.)   This Court disagrees. Subsection (b) provides that "where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title."  13 PA. C.S.A. § 2719(b). However, the phrase "remedy may be had as provided in this title" must be viewed in its fullest sense. Piper Jaffray, 2005 U.S. Dist. LEXIS 7497, *18-19.  The phrase refers to the entire UCC, including subsection (a) (which provides that damages may be limited or altered) and subsection (c) (providing for the limitation of consequential damages).   Therefore, a remedy may be had under subsection (b), but only to the extent that damages have not been otherwise limited under the other subsections. Piper Jaffray, 2005 U.S. Dist. LEXIS 7497, *18-19.

Notably, comment 1 to Section 2719 indicates that when an exclusive or limited remedy fails of its essential purpose, that specific remedy must be voided; however, the Comment gives no

indication that the limitations in other subsections also are voided.  Id. at *19-20 (citing 13 PA. C.S.A. § 2719 cmt. 1 ("where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of the UCC")).

Further, this reading is consistent with the policy underlying Section 2719.  The purpose of Section 2719 is to allow parties to shape the remedies to suit their needs.  Id.  The Third Circuit has even recognized that limitation of liability clauses "are a way of allocating unknown or undeterminable risks . . . and are a fact of everyday business and commercial life."  Valhal Corp. v. Sullivan Assocs., Inc., 44 F. 3d 195, 204 (3d Cir. 1995); 13 PA. C.S.A. § 2719 cmt. 3.  In this instance, Polymer and Bayer both agreed to these provisions and accordingly determined how their risks would be allocated.

Additionally, Polymer did not present sufficient evidence of breach of warranty to justify a failure of exclusive remedy instruction.  Polymer did not assert breach of warranty claims in its Complaint; nor did it present evidence that Bayer did not comply with the warranties in the contract. This court is only required to instruct the jury on issues raised by the pleadings and supported by the evidence.  Hewlett v. Davis, 844 F.2d 109, 114, 116 (3d Cir. 1988).  Therefore, the Court properly declined to give a failure of exclusive remedy instruction.

**b. Limitation of Liability Clause**

Polymer further argues that it is entitled to a new trial on the breach of contract and negligent misrepresentation claims because the Court should have stricken the limitation of liability clause as unconscionable.  (Pl.'s Post Trial Mem. at 28.)  However, Polymer has not shown that the

clause was unconscionable, and this Court denies Polymer's Motion.

As noted, limitation of liability clauses are routinely enforced by Pennsylvania courts under the Uniform Commercial Code, particularly when "contained in sales contracts between informed business entities dealing at arm's length, and there has been no injury to person or property." Valhal, 44 F. 3d at 203-204; see, e.g., New York State Elec., 387 Pa. Super. 537, 564 A.2d 919, 924 (1989). Courts differentiate between limitations on damages in personal injury cases versus property. Such limitations are not favored in personal injury cases, but no prejudice applies to property losses. Chatlos, 635 F.2d at 1087; 13 PA. C.S.A. § 2719(c).

Polymer, however, reasserts its argument that where the seller causes the exclusive remedy to fail of its essential purpose, then the limitation of liability is inoperative. Although Chatlos recognizes that failure of the exclusive remedy is not irrelevant to the unconscionability determination, it downplays its importance: "the repair remedy's failure of essential purpose, while a discrete question, is not completely irrelevant to the issue of the conscionability of enforcing the consequential damages exclusion." 635 F. 2d at 1086-1087. Thus, even if one were to assume failure of exclusive remedy, it alone is not enough to prove unconscionability. Chatlos focuses the inquiry instead on unequal bargaining power and allocation of the risk.

In Chatlos, the Third Circuit reviewed the disparity in the parties' bargaining power or sophistication and determined that there was no disparity where the plaintiff had "some appreciation of the problems that might be encountered." Id. Chatlos then considered the circumstances surrounding the allocation of the risk, and it found that there was no issue because the limitation was "expressed in a short, easily understandable sales contract," not hidden in a "linguistic maze."

635 F. 2d at 1087. As such, the risk was properly allocated. Id.

Indeed, such clauses are a way of allocating "unknown and undeterminable risks." Valhal, 44 F.3d at 204. The limitation simply must be reasonable and not so drastic as to remove the "incentive to perform with due care." Id.; see also Carter v. Exxon Co., 177 F.3d 197, 207 (3d Cir. 1999) (finding that a determination of unconscionability depends upon "the bargaining power of the parties, the conspicuousness of the putative unfair term, and the oppressiveness and unreasonableness of the term"). Even where the defendant fails to repair or replace the product, that is not enough to make the limitation unconscionable. Northeastern Power, 1999 U.S. Dist. LEXIS 13437, *55. Additionally, Section 2719, cmt. 3 states that limitation of liability clauses are "merely an allocation of unknown or undeterminable risks. The seller in all cases is free to disclaim warranties in the manner provided in Section 2-316."

This case clearly involves a commercial dispute, and as such, limitation of liability clauses are not disfavored in Pennsylvania courts. Id. Moreover, the parties were of equal bargaining power and sophistication. Although Polymer did not have experience in high pressure machines, it had significant experience in low pressure machines and also had negotiated numerous contracts for the purchase of complex equipment. However, even if the parties were not of equal sophistication, that alone is not enough to render the limitation of liability clause unconscionable. Unequal bargaining power alone does not render the contract unconscionable. Klopp, Inc. v. John Deere Co., 510 F. Supp. 807, 811 (E.D. Pa. 1981), aff'd, 676 F.2d 688 (3d Cir. 1982); see Jim Dan, 785 F. Supp. at 1201 (finding that the parties were not unequal where plaintiff was entering a new business venture, plaintiff's president was an experienced businessman, owned similar businesses for many years, and had made other contracts).

33

Both parties also recognized that there were unknown risks.  PDI had a system that was not completed and a product not finalized at the time Bayer sold the machines.  Bayer then incorporated the commonly used limitation of liability clause into the contract.  Polymer did not raise an objection to the clause.  Rather, Polymer signed the lease agreements for the three previous machines and received proposals, all of which contained the limitation on liability provision. Polymer cannot now claim that they did not understand the contract or the risk. Therefore, the limitation of liability clause was not unconscionable, and this Court denies Polymer's Motion.

### III. POLYMER'S MOTION TO ALTER OR AMEND THE JUDGMENT

Polymer contends that the fraud verdict was against the weight of the evidence and requests that the judgment be altered or amended in its favor.  According to Polymer three separate incidents of fraud occurred: 1) Bayer's delivery of HK135 equipment originally built for General Electric; 2) Bayer's failure to disclose the misapplication of the Dan Foss valves and continued sale of the those valves; and 3) Bayer's sale of "counterfeit" parts from Boice Industries in lieu of L'Orange pintles and nozzles.  See (Pl.'s Mem. at Ex. B), Danfoss valves fraud (See Pl.'s Mem. at Ex. C); and HK135 fraud (See Pl.'s Mem. at Ex. D).  Polymer contests that the evidence of fraud concerning counterfeit parts was "colossal" and that the jury should have returned a verdict in its favor. However, Polymer's analysis is both redundant and incorrect.

### A.    Legal Standard

FED. R. CIV. P. 59(e) permits a party to move to alter or amend a judgment within ten days of the entry of the judgment.  The purpose of a motion for reconsideration is to "correct manifest errors of law or fact" or "to present newly discovered evidence."  Harsco Corp. v. Zlotnicki, 779

F.2d 906, 909 (3d Cir. 1985).  Accordingly, a judgment may be altered or amended if the party

seeking reconsideration shows at least one of the following grounds: (1) an intervening change in

the controlling law; (2) the availability of new evidence that was not available when the court

granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or

to prevent manifest injustice.  Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros, 176 F.3d 669,

677 (3d Cir. 1999).  Because federal courts have a strong interest in the finality of judgments,

motions for reconsideration should be granted sparingly. Douris v. Schweiker, 229 F. Supp. 2d 391,

408 (E.D. Pa. 2002).   Dissatisfaction with the Court's ruling is not a proper basis for

reconsideration. Reich v. Compton, 834 F. Supp. 753, 755 (E.D. Pa. 1993); Central Reserve Life

Ins. Co. v. Marello, No. 00-3344, 2001 U.S. Dist. LEXIS 281 (E.D. Pa. Jan. 17, 2001), aff'd, 281

F.3d 219 (3d Cir. 2001).

**B.      Discussion**

Rule 59(e) motions to alter or amend judgments are only granted if there exists an

intervening change in the law, to reflect new evidence not available at trial, or to prevent clear legal

error.  Max's Seafood Café, 176 F.3d at 677.  PDI states that it seeks to amend the judgment to

correct legal error and to prevent manifest injustice.

Polymer's claim for fraud required that Polymer prove by clear and convincing evidence six

essential elements: (1) Bayer made a representation to Polymer; (2) those representations when

made by Bayer were false; (3) the representations were known by Bayer to be false when made or

that Bayer made representations recklessly; (4) Polymer Dynamics relied on the representation and

was deceived by it; and (5) the misrepresentations were the proximate cause of injury to Polymer.

35

Jury Instruction Fraud Claim.  The jury's verdict that in favor of Bayer finding specifically that Polymer failed to establish by clear or convincing evidence one or more of the six element of fraud. This Court may not disturb this verdict unless it is not supported by the weight of the evidence or contrary to law.  Olefins Trading v. Han Yang Chem. Corp., 9 F.3d 282 (3d Cir. 1993).

Polymer's contention that the jury is contrary to law is unsupported.  Polymer's bald assertion that "the evidence is clear that Bayer committed fraud in numerous ways . . ." does not provide any basis to determine that they jury's verdict was contrary to law.  .  Since Polymer has failed to meet its burden in this regard the Court will not disturb the jury verdict on this basis.

Furthermore, the jury's verdict was supported by sufficient evidence.  Polymer refers to evidence and the testimony of several witnesses which Polymer characterizes as "undisputed" in establishing that, unknown to Polymer, Bayer elected to substitute two non-specified, non-compliant HK 135 machines originally built for General Electric Company.  However, on May 31, 2005, Mr. James Shoup, project manager for the project that was sold to PDI, testified as follows:

> Q:   Sir isn't it correct that the two first machines delivered to PDI has actually been built for GE two years prior?
>
> A:   The frames.  It might have been the frames.  I don't know that for sure
>
>              . . .
>
> A.   : . . . Now the thing you have to remember here is what they, [Polymer],were transferring is not the whole PDI machine. This is part of it. This is not the frame with the two metering pumps on it.  This is not the whole PDI machine. This is not the day tanks, the feeding pumps, the heat exchanges, the hoses, the control panels, the controls, the instrumentation. This is the frame and the two pumps on it.
>
>              . . .
>
> A:   These pumps had never been used . . . .
>
>              . . .
>
> Q:   Mr. Shoup, in June 1996, . . . did anyone from Bayer say what we are

delivering to you, what we did was take two 135 machines that had been built for someone else and switched them over and changed the components on them to make them into HK270s?  Did anyone say that to my clients?

A:    I don't recall.  But what . . . we are talking about is the basic frame, motors, and pumps for a HK 135.  Whether that went to whoever, it's still an HK 135 pumps (sic) and motors and it's out of our inventory.  It's no different if we go in the back in the MIMS systems, and take the pieces off the shelf that we used to build these standard units with.

. . .

A:    Yes.  And if you go back to the thing you showed me before, you will see tht there this a different motor on the polypol side.  That is what makes a 135 a 270.  It's having a bigger motor on the polypol side.

(N.T. 5/31/07 at 35, 41, 43-44).

From the testimony of Mr. Shoup, the jury could infer that the machines delivered to Polymer were in compliance with the parties' agreement and that the machines delivered to PDI were not originally built for General Electric.

Regarding Plaintiff's claim that Bayer failed to disclose the misapplication of the Dan Foss valves and continued sale of the those valves.  On cross-examination Mr. Shoup testified as follows:

Q:    . . . R.L. Martin is telling you that that application that (sic) is causing wear because you were using these [Danfoss valves] improperly, correct?

A:    Yes.

Q:    And you never gave this to PDI, did you?

A:    I discussed this with Craig [Peoples] because after this we has a prototype valve made, and it was sent to PDI for them to try.

. . .

Q:    [D]o you have a specific recollection of ever discussing [the R.L. Miller report detailing the alleged improper valve usage] with him?  You didn't, did you?

A:    Yes, because we sent a prototype valve on later to try another type of valve.

N.T. 5/31/05 at 65, 70.

37

On re-direct examination Mr Shoup testified:

> Q: What was your experience with the use of Danfoss valves on high pressure machines?

> A: Again, the first machine I ever worked on had Danfoss valves for back pressure controls. Used them for all of those years. They are still being used today.

> Q: And can you compare the type of valve that Mr. Peoples is currently using what you are suggesting?

> A: Both of these valves are still cartridge style hydraulic relief valves. The Danfoss valve is a direct acting valve – I mean it's a pilot operated valve, the one we use. The one they use is direct acting valve (sic), but it still does the same function. They were still hydraulic.

>        . . .

> A: Well the test results was the fact that (sic) we had been using Danfoss valves as back pressure controls for years . . . . The R.L. Miller salesman has been selling them to use for years. The actual valve, the pilot hole is drilled out to 70 thousandths, which is part of Bayer's specification for that valve to be used in polypol service.

> Q: And immediately after – and what discussions did you have with Mr. Peoples concerning that report from R.L. Miller?

> A: We talked about the report. We talked about other options. And one of the options was to use the injector as a back pressure control cause it would eventually trap. That's the only other solution knew at the time . . . .

>        . . .

> Q: Why did you tell Mr. People to go to R.L. Miller directly?

> A: To save himself (sic) some money. Go ahead and buy them off my supplier to save yourself some money.

N.T. 5/31/05 at 95, 96, 100.

>        . . .

Mr. Donald Folajtar, Bayer general manager testified:

> Q: What do you understand the communications to be at the time between R.L. Miller, Danfoss, PDI and Hennecke?

> A: . . . What I heard Mr. Peoples say was that he had never seen the report, but he really couldn't remember if Mr. Shoup had discussed it with him. And I heard Mr. Shoup say that he discussed it with him because this was the result of that discussion. This is not something that could have happened if Mr. Peoples hadn't

been involved in that loop.

Q:    . . . You were also asked some questions about how much research Bayer did into the validity or the usefulness of the Danfoss valves . . . what was your answer?

A:    . . . We have been supplying these Danfoss valves on our equipment for years, since the early '80s, and very successful with them.  We actually had Danfoss modify them for us for use with polypol and isocyanate. It was a modification that Danfoss did for us so that it would allow it to function better. So we had no reason to expect that they would not operate for Polymer Dynamics as well.

N.T. 5/31/05 at 43-44.

From the testimony of Mr. Shoup and Mr. Folajtar, it is entirely feasible that the jury could reasonably conclude that not only did Bayer disclose the R.L. Miller's report opining that the Dan Foss valves had been misapplied but also that PDI had failed to carry its burden of proof on Bayer's alleged continued sale of the those valves.  The jury could have reasonably inferred that the representations regarding the Dan Foss valves were not known by Bayer to be false when made and that Bayer did not make representations recklessly.

On Plaintiff's allegation that Bayer sold "counterfeit" parts from Boice Industries in lieu of L'Orange pintles and nozzles, the record of evidence could reasonably be interpreted to reveal that the parts included in PDI's machines came from Bayers' inventory and that there was no fraudulent conduct by Bayer.  Alternatively, the jury had a reasonable basis to determine that Polymer had failed to meet it's burden on the issue of fraud.  After reviewing the record of evidence and the notes of testimony, this Court can find no clear error of law or fact.[11]  Furthermore, Polymer has not satisfied this Court that the jury's verdict on the issue of fraud imparts manifest injustice.

---

[11] From the testimony of Mr. William Clarkin, an employee Hennecke Machinery Group of the Bayer Corporation, the jury could reasonably conclude that Bayer used parts as they available and did not knowingly or recklessly represent to PDI that certain parts provided were manufactured by Boice Industries rather than L'Orange. Morever Mr. Clarkin stated that the Boice nozzles were never sold by Bayer to any customer including Polymer. N.T. 5/20/05 at 48. This testimony could prudently be deemed credible and serve to undermine Polymer's allegations.

39

Therefore, the Court finds that there is no factual or legal basis for reversing the jury's fraud verdict. Since, Polymer has not sustained its burden in establishing any of the requisite factors, its motion is denied.

## IV.   BAYER'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) OR TO ALTER OR AMEND JUDGMENT PURSUANT TO RULE 59(e)

### A.   Legal Standard

In reviewing a motion for judgment as a matter of law pursuant to FED. R. OF CIV. P. 50, the court must determine whether there is sufficient evidence upon which a reasonable jury could properly have reached its verdict. Judgment as a matter of law may be granted only if "there is no legally sufficient evidentiary basis for a reasonable jury to find in favor of the non-moving party." Valentin v. Crozer-Chester Med. Ctr., 986 F. Supp. 292, 298 (E.D. Pa. 1997). "The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict." Gomez v. Allegheny Health Serv. Inc.,71 F.3d 1079, 1083 (3d Cir. 1995); see Goodman v. Pennsylvania Turnpike Comm'n, 293 F.3d 655, 665 (3d Cir. 2002). The court must view the evidence in the light most favorable to the non-moving party, and "every fair and reasonable inference" must be drawn in that party's favor. Valentin, 986 F. Supp. at 298 (citing McDaniels v. Flick, 59 F.3d 446, 453 (3d Cir. 1995)). The Court of Appeals for the Third Circuit has held that "judgment as a matter of law should be granted sparingly, a scintilla of evidence will not enable the non-movant to survive a Rule 50 motion." Goodman, 293 F.3d at 665. Furthermore, the key to surviving a party's Rule 50 motion is a legally sufficient evidentiary basis for the verdict.

The Rule 59(e) standard is discussed *infra*.[12]

## B. Discussion

Bayer moves for the entry of judgment as a matter of law contending that since the jury did not find Bayer liable for fraud, the jurors were required to follow the Court's instructions that damages could be awarded only for breach of contract or negligent misrepresentation in accordance with the limitation of liability clause in the agreements between the parties. Those agreements between PDI and Bayer bar any claim for lost profits.[13] According to Bayer, the only contract damages evidence introduced by PDI was set forth in the exhibit titled "Equipment Purchased to Resolve Bayer Failure" ("Exhibit 419"). Bayer submits that the verdict was excessive as a matter of law for two reasons: 1) the verdict of $12,500,261.00 exceeded those damages provided for by the agreements between the parties; and 2) the paucity of evidence, other than Exhibit 419 (and the related testimony), proves that the jury's verdict of $12,500,261.00 must be reduced to $284,000.00.[14]

Polymer counters that there is sufficient evidence to support the jury's award. The fact that the Court instructed the jury on the limitation of liability clauses means that the jury, with those provisions in mind, nonetheless awarded damages for breach of contract in the amount of

---

[12] See Part III, Section A, *infra* for the Rule 59(e) standard.

[13] As addressed supra, both the 1996 and 1997 Agreements contain limitation of liability clauses that restrict PDI's recovery to contact damages. See Def.'s Mem. at Ex. D and E.

[14] Bayer calculates this figure as follows: At trial, Bayer's accounting expert Mr. Nihill, testified that the present value of the expenditures in Exhibit 419 is $330,000. One of the expenditures listed in Exhibit 419 is $46,000 to purchase warehouse space to house a Weldon grinder. As the 1996 agreement between the parties specifically bars any claim for "loss or reduction in use of any facilities including existing facilities", PDI is not permitted to recover this alleged expense. Subtracting these amounts from Mr. Nihill's calculation, Bayer argues that PDI is entitled to no more than $284,000 once the limitation of liability provisions are appropriately applied.

$12,500,261. Polymer contends that the evidence presented regarding its attempts to correct the failures of the Bayer machines can support the award. For example, the testimony at trial showed that it cost Polymer millions of dollars to replace the nozzles and pintles on the malfunctioning Bayer machines. Furthermore, Polymer contends that the money spent on labor to diagnose the problem with the Bayer machines is also recoverable. All of these damages, Polymer argues, arise from Bayer's breach of contract. Furthermore, Polymer asserts that the contractual limitation of liability is unconscionable and should not be enforced.[15]

Having been instructed that lost profits "are only available upon a finding of fraud" the jury was indeed limited to awarding damages for breach of contract and negligent misrepresentation only. (Jury Instructions 37-38.) However, contrary to Bayer's contention, Exhibit 419 cannot be construed as the sole evidence presented on these issues. Rather, the jury also heard the testimony of Plaintiff's expert Dr. Kolbe as well as that of Richard Hanson, Bill Peoples, Edward Day, and Deborah Kocher. In accordance with the Rule 50 standard, the Court will view the evidence in a light most favorable to PDI.

### 1. The Damages Standard

The general rule in Pennsylvania is that if damages are difficult to establish, an injured party need only prove damages with a reasonable certainty. Id.; see also Scobell, Inc. v. Schade, 688 A.2d 715, 719 (Pa. Super. Ct. 1997); Sobers v. Shannon Optical Co., 473 A.2d 1035, 1039 (Pa. Super Ct. 1984). "Doubts are construed against the breaching party." ATACS Corp., 155 F.3d at 669. The Third Circuit defines reasonable certainty as a "rough calculation that is not 'too

---

[15] In its Motion for New Trial, Polymer proffers this identical argument; namely, that the limitation of liability clause is unconscionable and should not be enforced. The Court disagrees and addressed this issue, supra.

speculative, vague, or contingent' upon some unknown factor." Ware v. Rodale Press, Inc., 322

F.3d 218, 226 (citing ATACS Corp., 155 F.3d at 668). However, the reasonable certainty standard

"does not . . . preclude 'some uncertainty as the precise amount of damages incurred.'" ATACS

Corp., 155 F.3d at 670 (citing Pugh v. Holmes, 405 A.2d 897, 909 (Pa. 1979). In ATACS, the

Court of Appeals for the Third Circuit pointed out that the Pennsylvania Supreme Court recognized

"the difficulty or even impossibility of the production of such proof." 155 F.3d at 670. The court

also cautioned however that in such cases the evidence should "with a fair degree of probability"

provide a basis by which damages may be assessed. Id. This Court finds no basis to amend the

jury's award.

### 2.     Testimony on the Issue of Damages

The jury heard testimony regarding not only the cost of the equipment to diagnose and

correct the problems but also the human effort and ingenuity to arrive at those solutions. Richard

Hanson testified that it took "millions of dollars" to diagnose and resolve the problems with the

Bayer machines, money that, according to PDI, could have been applied to developing the

company's production systems. Bill Peoples confirmed that PDI spent "$10 million" to develop

nozzles and pintles. Edward Day testified that PDI was forced to make better nozzles and pintles

and "spent millions and millions" of dollars doing so. Bayer contends that the testimony of the four

witnesses cited by PDI does not constitute evidence of labor costs incurred by PDI with reasonable

certainty. Bayer maintains that PDI neither offered any specific values of time spent and dollars

incurred, nor presented any data which would have supported those specifics, and thus did not

sustained its burden of establishing damages to a reasonable certainty at trial. However the standard

for the calculation of damages does not require precision. While testimony of PDI's witnesses does

43

leave some uncertainty as to the exact amount of labor costs and research and development of remedying the defects in the Bayer machinery, such uncertainty will be construed against the breaching party—Bayer.

Bayer also attacks the testimony of Dr. Kolbe, PDI's damages expert, citing ID Sec. Sys. Can., 249 F. Supp. 2d 622 (E.D. Pa. 2003), to support is contention that the expert's testimony was insufficient to support the jury award. In ID Sec. Sys. Sec. Can., defendant attacked the court's determination that plaintiff's expert had met the Daubert standard since the expert's basis for calculating lost profits was unreliable. Id. at 694. After review of the record, Judge Robreno determined that admitting plaintiff's expert's testimony in regard to lost profits was error. Id. at 695. However, Bayer's reliance on ID Sec. Sys. Sec. Can. is misplaced since, in that case, defendants specifically reasserted its challenge to the admissibility of plaintiff's expert's testimony. Id. In the instant matter, Bayer does not challenge the admissibility of Dr. Kolbe's testimony. Instead Bayer attacks the weight that the jury apparently granted Dr. Kolbe's testimony. However, "[a] party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination." Id. (citing Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002). Bayer's opportunity to attack Dr. Kolbe's testimony would have been during cross-examination. Absent a specific Daubert objection, it is not the province of this Court to endeavor a *post hoc* determination that Dr. Kolbe's testimony should not have been regarded as credible. Thus, the testimony of Dr. Kolbe was legally sufficient to support the jury award and is supported by legally sufficient evidence.

The Court will not ignore the testimony of the various witnesses regarding expended

resources for employee hours worked and other labor costs.  Furthermore, the testimony of Dr. Kolbe provides a legally sufficient basis for the jury's award since Bayer does not assert that a specific <u>Daubert</u> objection to Dr. Kolbe's testimony.  Drawing all reasonable inferences in favor of Plaintiff, the prevailing party in this action, the Court is persuaded that the testimony of PDI's witnesses regarding damages was deemed credible by the jury and provided a reasonable basis for its award.

3.    **Altering the Verdict**

Contrary to the cases cited by Bayer there exists no "identifiable sums included in the verdict that should not have been there." <u>C.L. Maddox, Inc. v.  Benham Group, Inc.</u>, 88 F.3d 892, 603 (8th Cir. 1996).  "Except when 'it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there,' a trial judge should not unconditionally reduce the amount of damages awarded by verdict, for to do so impermissibly encroaches upon the litigants' constitutional right to a jury." <u>Carter v. District of Columbia</u>, 795 F.2d 116, 134 (D.C. Cir. 1986)(citing 1 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2815, 99 (1973).  The Court of Appeals for the District of Columbia offered other examples of "readily identifiable sums." For instance, where a trial court, employing a special verdict, which erroneously allows the jury to render an award for punitive damages, that segregated, precisely stated award would be readily identifiable as relating to a wholly discrete issue of law, and the special verdict could be rectified by the court without further jury proceedings.  <u>See</u> <u>Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 256 n. 12 (1981); <u>see also</u> <u>Scottish Union & National Ins. Co. v. Bejcy</u>, 201 F.2d 163, 166 (6th Cir. 1953).  Other examples of readily identifiable sums incorporated in a verdict that "should not been there"  include interest, <u>see</u> <u>New York, L.E. & W. R.R. v. Estill</u>, 147 U.S.

591, 619-22 (1893), and the amount that should have been subtracted under an insurance policy's apportionment clause, see Westchester Fire Ins. Co. v. Hanley, 284 F.2d 409, 418 (6th Cir. 1960) (applying insurance policy's apportionment clause to reduce plaintiffs' recovery to 75% of total damages jury determined plaintiffs had suffered). See also Crossman v. Fontainebleau Hotel Corp., 346 F.2d 152, 153 (5th Cir. 1965) (judgment reduced by witness travel expenses and fees for which there was no entitlement under the applicable law).

Although Bayer surmises that the jury's award reflects lost profits which were precluded by the contract and thus awarded in error, this Court is not persuaded. First, courts will assume that jurors follow their instructions. Shannon, 512 U.S. at 585; see also Richardson, 481 U.S. at 206. Bayer concedes that the Court's instructions could not have been more clear. (Bayer's Mot. J. Matter L. 6). Furthermore, Bayer offers that the Court's instructions were not just unambiguous but they reflected the law as recognized and accepted by counsel by both parties. (Id.) The Jury Interrogatories, moreover, provided spaces for the jury to fill in amount of total damages for fraud, as instructed since the jury did not find fraud the space provided for fraud damages was left blank. This Court will, therefore, assume the jury understood and followed its clear instructions. Second, at trial, the PDI presented evidence which reflected its estimate that the minimum amount of lost profits damages was $70.3 million. (PDI Trial Ex. 2303A). The jury's award of $12,500,261 does not reflect even the minimum amount of lost profits. Nonetheless, even if the Court agreed that the jury's award is excessive, the Court cannot ascertain any readily identifiable sum included in the award which should not have been there.

46

## VI. CONCLUSION

For the foregoing reasons, this Court will deny Plaintiff's Motion for New Trial or to Alter or Amend the Judgment and deny Defendant's Motion to Alter or Amend the Judgment. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| POLYMER DYNAMICS, INC., | : | |
|---|---|---|
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | **NO. 99-4040** |
| **v.** | : | |
| | : | |
| BAYER CORPORATION, | : | **FILED** |
| **Defendant.** | : | |
| | : | |
| | : | ~~~~ 2007 |
| | **ORDER** | MICHAEL E. KUNZ, Clerk |
| | | By_____ Dep. Clerk |

AND NOW, on this $\underline{10}$ day of August 2007, upon consideration of Defendant's Motion

for Judgment as a Matter of Law or in the Alternative to Alter or Amend the Judgment (Docs.

279 & 289), Plaintiff's Response in Opposition (Docs. 280 & 298), Plaintiff's Motion to Alter

or Amend the Judgment or in the Alternative for a New Trial (Docs. 281 & 290), Defendant's

Answer and Brief in Opposition (Docs. 285 & 299), Plaintiff's Supplement to Its Post-Trial

Motion (Doc. 286) and oral argument on held before the Court on Monday, November 21, 2005,

**IT IS HEREBY ORDERED AND DECREED** that Defendant's Motion for Judgment as a

Matter of Law or in the Alternative to Alter or Amend the Judgment (Docs. 279 & 289) and

Plaintiff's Motion to Alter or Amend the Judgment or in the Alternative for a New Trial

(Docs.281 & 290) are **DENIED.**

BY THE COURT:

**Petrese B. Tucker, U.S.D.J**

48